1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10    GREGORY SMITH,

11              Plaintiff,                    No. CIV S-10-0762 CKD P

12         vs.

13    ALAN NANGALAMA, et al.,                 ORDER &

14              Defendants.                   FINDINGS AND RECOMMENDATIONS

15    _____/

16              Plaintiff, a state prisoner proceeding pro se, has filed a civil rights action pursuant

17    to 42 U.S.C. § 1983.  This action is proceeding on the original complaint, filed March 31, 2010.

18    (Dkt. No. 1.)  On June 7, 2011, the previously assigned magistrate judge issued an order stating

19    that plaintiff had alleged cognizable Eighth Amendment and state law negligence claims against

20    defendants Nangalama, Hamkar, Ma, Teachout, and Sweeney.  (Dkt. No. 12)  Pending before the

21    court is defendants Nangalama, Hamkar, Ma, and Teachout's[1] December 15, 2010 motion to

22    dismiss the claims against them for failure to state a claim pursuant to Rule 12(b)(6) of the

23    Federal Rules of Civil Procedure.  (Dkt. No. 30, hereinafter "Mot.")  Plaintiff filed an opposition

24    to the motion, and defendants filed a reply.  (Dkt. Nos. 39, 42.)  For the reasons set forth below,

25    _____

26         [1] As described _infra_, Teachout has withdrawn the motion to dismiss as to one of
      plaintiff's claims.

1

1   the court will recommend that defendants' motion be granted in part and denied in part.

2   BACKGROUND

3         Plaintiff, an inmate at California State Prison-Solano, alleges that defendants

4   showed deliberate indifference to serious medical needs.  Plaintiff's allegations concern his

5   medical treatment both leading up to and following his January 2009 surgery to remove a

6   cancerous growth in his neck.  At all times relevant to this action, defendant doctors Nangalama,

7   Hamkar, and Ma, and licensed vocational nurses Teachout and Sweeney, were employed at

8   California State Prison-Sacramento (CSP-Sacramento.)  (Dkt. No. 1 (Cmplt.) ¶¶ 6-10.)

9   I. Pre-Surgery Allegations

10        A.  Referral to UCD Medical Center

11        In January 2008, while incarcerated at Pelican Bay State Prison, plaintiff noticed a

12  mass under his left jaw.  (Dkt. No. 1-1 at 2-3[2] (Ex. Y))  After a July 2008 biopsy on his lymph

13  node tested positive for squamous cell carcinoma, petitioner was referred to an outside Ear, Nose,

14  and Throat specialist (ENT) for evaluation so that the primary cancer site could be determined.

15  (Cmplt. Ex. B, C, F, G.)  Physician's progress notes dated September 9, 2008 state that an

16  "urgent referral has been made to UC Davis ENT . . . Results of biopsy and CT [Computed

17  Tomography] chest, abd, pelvis faxed to UCD ENT.  P[atient] seen by Dr. Polidore, who verbally

18  indicated [patient] will probably need panendoscopy[3] and/or radical neck.  As these services are

19  not done by him [and] not available anywhere near our area, referral made to UCD." (Id. Ex. G.)

20  \\\\\

21

22      [2] Citations are to page numbers assigned by the court's docketing system.

23      [3] Defined as "[e]xamination, usually with the patient under general anesthesia, of the
    pharynx, larynx, upper trachea, and esophagus with rigid and flexible endoscopes."

24  http://www.medilexicon.com/medicaldictionary.php?t=64705 (last accessed September 21,
    2011).

25

26

1    Plaintiff was transferred to CSP-Sacramento for a September 23, 2008

2   appointment at the UC-Davis Medical Center.  (Id. Ex. A, B.)  However, plaintiff was not

3   allowed to attend his scheduled appointment because the institution was on contraband watch

4   that day and correctional officers deemed plaintiff's appointment a security risk.  (Id. ¶¶ 18-20,

5   Ex. E.)

6    B.  Dr. Nagalama

7    On September 25, 2008, plaintiff was seen by defendant Dr. Nangalama at CSP-

8   Sacramento.  Plaintiff explained to Dr. Nangalama "that he was transferred to CSP-Sac for

9   cancer treatment.  During this visit plaintiff explained that Dr. Williams, [his Primary Care

10  Physician at Pelican Bay State Prison], explained the prognosis without the discovery of the

11  primary site his 'condition would degenerate to terminal.'"  Dr. Nangalama did not physically

12  examine plaintiff, but reviewed his file and stated: "I don't see why your [sic] down here.  Your

13  cancer is benign."  (Id., ¶¶ 21-23, Ex. F.)  Plaintiff stated: "If I don't have cancer then send me

14  back."  (Id. ¶ 24.)  Dr. Nagalama's treatment notes state that plaintiff had "CT- Head, Chest,

15  Abd[omen] and Pelvis done - No evidence of metastic disease."  Dr. Nagalama noted that

16  plaintiff had squamous cell cancer of "lymph in neck - without evidence metastic cell disease per

17  CT."  He noted that plaintiff was scheduled for a follow-up appointment at UC-Davis the next

18  week, but wanted to return to Pelican Bay.[4]  Dr. Nagalama noted that he had briefly discussed

19  the course of treatment with another doctor and a nurse, with further discussion to follow.  (Id.,

20  Ex. F.) This appointment constituted plaintiff's only interaction with Dr. Nangalama.

21    After leaving Dr. Nagalama's office, plaintiff told a non-defendant nurse that Dr.

22  Nangalama had diagnosed his cancer as benign and plaintiff "guessed he was going back to

23  PBSP."  (Id. ¶ 25.)  The nurse "expressed concern with the diagnosis" and consulted with another

24  non-defendant nurse, who told plaintiff to seek a second opinion and referred him to non-

25  
   _____

26       [4] It is not clear whether defendant was referring here to plaintiff's statement: "If I don't
   have cancer then send me back."

1   defendant Nurse Practioner (NP) Bakewell.

2          After talking with plaintiff, NP Bakewell agreed that plaintiff should  "attend his

3   ENT evaluation at UCD."  However, due to a series of bureaucratic delays that did not directly

4   involve the named defendants (except as described below), plaintiff was not seen at UCD

5   Medical Center until December 2008.  (Id. at ¶¶ 27-43.)

6          C.  Dr. Hamkar

7           On November 13, 2008, plaintiff was seen by defendant Dr. Hamkar.  Plaintiff

8   explained that he had cancer with an unknown primary and that his most recent appointment with

9   a UC-Davis ENT had been cancelled.  Dr. Hamkar told plaintiff that he would submit a form

10  requesting an urgent specialty consultation.  (Cmplt. at ¶¶ 44-45.)  However, on the referral form

11  completed that day (whether by Dr. Hamkar or a nurse is not clear), the form was not clearly

12  marked as "urgent."[5] (Id. ¶ 49, Ex. S.)

13         On December 2, 2008, plaintiff informed nursing staff that 19 days had passed

14  since Dr. Hamkar had issued an "urgent" referral to a ENT specialist.  The nurse found the

15  referral form that was not clearly marked as urgent, and consulted with Dr. Hamkar.  Another

16  referral form was filled out, this time correctly marked "urgent."   (Id. ¶¶ 48-49.)

17         On December 7, 2008, plaintiff discovered another lump in his neck just below

18  the previous lump.  (Id. ¶ 52.)

19         On December 9, 2008, a specialist at the Davis Medical Center, Dr. Aouad,

20  diagnosed plaintiff with "squamous cell carcinoma of the left neck, unknown primary."  Dr.

21  Aouad allegedly informed plaintiff that his cancer was "extremely aggressive and required urgent

22  surgery[.]"   He noted in his report that plaintiff had lost 37 pounds since January 2008, and

23

24          [5] As defendants note, the referral was marked "urgent," "routine," and "ASAP," with the
latter two markings crossed out with a large "X."  (Id., Ex. S.)  Construing the pleadings in the

25  light most favorable to plaintiff, the court construes the form as containing "conflicting
information," as all three boxes were circled, and a nurse had to consult with Dr. Hamkar on

26  December 2, 2008 to determine what that meant.  (Id. ¶ 49.)

1  recommended that plaintiff get "the CT scan with IV contrast ASAP and get the report, get the

2  slides, and also I recommend that the patient getting panendo with biopsy including

3  tonsillectomy for evaluation and assessment of the primary.  Should the primary stay unknown,

4  the patient is a candidate for a left modified radical neck dissection and radiation therapy to his

5  neck and primary."  The specialist reported that he would "make an urgent request to get the CT

6  scan, slides, and schedule the patient for the panendo." (Id. ¶ 54; Dkt. 1-1, Ex. Y.)

7          On December 15, 2008, plaintiff was again seen by Dr. Hamkar.  He reported that

8  he had found another tumor, and that Dr. Aouad had recommended immediate surgery before the

9  cancer could spread further.  Dr. Hamkar made dismissive remarks.  However, two days later, he

10 submitted a request for services for a "CT neck with contrast" for plaintiff at UCD Radiology.

11 However, the form was marked "routine" rather than "urgent."  (Id. at ¶ 55-56; Dkt. No. 1-1 at 16

12 (Ex. 1A).)

13         On January 5, 2009, plaintiff had a panedoscopy and tonsillectomy procedure for

14 evaluation of the primary source of the cancer.  On January 7, 2009, he underwent an extended

15 modified radical neck dissection surgical procedure for squamous cell carcinoma of the left neck.

16 (Id. at ¶¶ 58-59; Dkt. No. 1-1 at 20-24 (Ex. 1C, 1D).)

17 II.  Post-Surgery Allegations

18         On January 19, 2009, plaintiff was discharged from the hospital to the prison "in

19 good and stable condition" with his "pain . . . well controlled."  The discharge report stated that

20 he "tolerated a soft diet" and was to have a "non fat diet until next clinic visit."  (Id. at ¶ 60; Dkt.

21 No. 1-1 at 25 (Ex. 1D).)  Medical notes indicated that plaintiff's recovery had been complicated

22 by a "chyle leak with significant output," which caused an accumulation of fluid in his neck.  The

23 problem was treated and the drains were removed. (Dkt. No. 1-1 at 25 (Ex. 1D).)  At discharge,

24 plaintiff was informed that he needed to elevate his head while sleeping so as not to complicate

25 his recovery.   (Id. at ¶ 62.)

26 \\\\\

5

1      A.  Dr. Ma and Nurse Teachout

2          Two days after his discharge, plaintiff was seen by defendant Dr. Ma.  He

3  informed Dr. Ma of his need for a non-fat, soft diet until his follow-up visit, and complained that

4  he had not eaten since his discharge as this diet was not being provided to him.  He asked Dr.

5  Ma's assistance in acquiring this diet.  Dr. Ma told plaintiff that he was aware of plaintiff's

6  condition and discharge instructions, but allegedly refused to place plaintiff on a special diet

7  stating, "the institution does not do special diets."  (Id. at ¶¶ 66-68.)  However, the physician's

8  order issued that day states that plaintiff was to have a non-fat diet until his next clinic visit "per

9  UCD recommendations" and that his head was to be elevated at a 30-degree angle with pillows.

10  (Dkt. No. 1-1 at 30 (Ex. 1E), 57 (Ex. 10).)  Dr. Ma also issued a chrono authorizing plaintiff to

11  obtain two extra pillows.  (Dkt. No 1-1 at 38 (1I).)

12          Later that day, plaintiff attempted to obtain his two extra pillows from defendant

13  Nurse Teachout.  Teachout refused to provide him these pillows, allegedly stating that the

14  pillows were not "medical issues."  Plaintiff notified Dr. Ma that he had not received the pillows

15  and that Teachout claimed it was a custody issue while custody claimed it was a medical issue.

16  Dr. Ma refused to help plaintiff get his pillows and directed plaintiff back to Nurse Teachout.

17  (Id. ¶¶ 69-70.)  Plaintiff claims that as a result he was forced for over two weeks to "resort to

18  such measures as sleeping upright, and attempting to make makeshift pillows from blankets and

19  rolling up his mattress," because "his mouth consistently filled with phlegm and thick saliva as

20  he slept, causing gagging, choking and irritating the throat."  (Id. ¶¶ 64-65.)  Plaintiff eventually

21  received his extra pillows on February 19, 2009, when correctional staff conducted a cell check,

22  determined that he did not have his recommended pillows, and provided them.  (Id. ¶ 70; Dkt.

23  No. 1-1 at 40-41 (Ex. 1J), 52 (Ex. 1M).)

24          As to plaintiff's medically recommended diet, plaintiff alleges that, around

25  January 23, 2009, Dr. Ma completed his research into plaintiff's diet issue and allegedly

26  "informed plaintiff that diets were issued [through] the chaplain for religious purposes."

However, Dr. Ma "prescribed a diet order to pharmacy" on a form stating: "Please give Mr. Smith low fat/ no fat diet x 14 days. " (Id. ¶ 73; Dkt. No. 1-1 at 57 (Ex. 1O).)  He also prescribed plaintiff two cans, twice a day, of nutritional supplement until his special diet arrived.  (Id. ¶ 74.)

A few days later, plaintiff filed a grievance for not getting his non-fat, soft diet and pillows.  In the course of responding to plaintiff's inmate grievance, Dr. Ma stated on February 25, 2009 (in records attached to the complaint):

> I saw you in my office on January 22, 2009, and I spent a lot of time explaining the diet issues.  There is no special medical diet on C-yard except for vegetarian diets for religious reasons.  I offered you to stay in OHU or CTC-1 in order to get the special diet, but you refused and insisted on having the special diet in C-yard.  You claimed that you saw special diets were given to non-religious people in the yard.  For this, I spent additional extra time to investigate.  After contacting and talking to numerous people, it was confirmed that there is no special diet for medical reason in C-yard and that all-special diets are either related to religion or ethnic reasons.  The special diet has to be issued by a chaplain.

(Dkt. No 1-1 at 61 (Ex. 1P).)

On January 27, 2009, plaintiff was provided only four days' worth of supplement drink and complained about the shortage to Nurse Teachout.  Teachout allegedly refused to investigate.  (Id. ¶¶ 76-77.)

On March 9, 2009, plaintiff began radiation therapy.  (Id. ¶ 78.)  On March 24, 2009, he was seen by Dr. Ma, who again prescribed a nutritional supplement, among other actions.  (Dkt. No. 1-1 at 73 (Ex. 1S).)

B. Nurse Sweeney

On April 1, 2009, plaintiff notified defendant Nurse Sweeney his supply of supplement drinks would be depleted the next morning, said he would "need it by the following morning as it was his only source of nutritional intake due to his inability to swallow." (Cmplt. at ¶ 79.)  Sweeney allegedly "refused to assist plaintiff, stating it was not her job to call the warehouse, that when they deliver it she will give it to him." (Id. ¶ 80.)

\\\\\

On April 3, 2009, plaintiff filed a "'sick call slip' in an attempt to acquire his Nutrien 1.5 before the weekend." That day, he was seen by Dr. Ma and Nurse Sweeney. He informed them that he was having difficulty receiving his nutritional drinks. Nurse Sweeney stated that shipments from the warehouse only came once a week, and he would have to wait until Monday. Dr. Ma refused to ask pharmacy staff why plaintiff was not receiving his prescribed nutritional drink and a mechanical soft diet. Plaintiff alleges that, as a result, he continued to suffer hunger, weight loss, stomach pains, and dizziness from lack of the supplement drink. (Id. ¶¶ 81-84.)

The following Monday, April 6, 2009, plaintiff received a case of the supplement drinks. (Id. ¶ 86.) Between April 9, 2009 and May 12, 2009, plaintiff complained repeatedly to Nurse Sweeney and Dr. Hamkar that he was not receiving enough nutritional supplement and could not swallow solid food. (Id. ¶¶ 90-110.) In a grievance dated May 6, 2009, plaintiff stated:

> Today is May 6, 2009 and I have not received my 42 cans of Nutrien 1.5 for the week beginning May 4, 2009 to May 10, 2009. I am supposed to drink 2 cans 3 times a day and these cans of Nutrien 1.5 should come regularly every week without me constantly reminding them of the fact. . . . I should not have to save some drinks . . . to ensure that I have something to eat because it almost inevitable that they will be short or won't come at all. My order is current and I am still having trouble eating solid food.

(Dkt. 1-1 at 108-109 (Ex. 2F).) In response, Nurse Sweeney wrote that plaintiff "continuously verbalized to others that he was not receiving Nutrien drinks"; that the drinks were discontinued and new orders were written for a substitute drink; and that on May 12, 009, plaintiff received the substitute drink as ordered. (Id.)

On May 11, 2009, plaintiff filed another grievance addressing the claim that his original nutritional drink had been discontinued.

> [T]his fact may be true however they should have made some arrangements to ensure that I have something to eat/drink during this switch. . . . [Plaintiff stated that he informed Nurse Teachout earlier that day that he was not receiving his nutritional drinks and she told him to "keep putting 602's into the warehouse because they haven't been sending your meal replacements or any one

1   else." 602ing the warehouse makes no sense as they are not
    informed of my health issues, and only follow the direct and
2   specific orders of medical. . . . [S]everal doctors and nurses
    are/were aware of the discontinuance of a certain supplement prior
3   to me running completely out of them, and as I have reminded time
    in and time out that everyone knows my situation . . . [Medical
4   staff] know I have extreme difficulty swallowing any sold food,
    and did nothing to help me get these drinks during this period so I
5   may receive some form of nourishment.

6   (Dkt. No. 1-1- at 115-116 (Ex. 2H).)  On May 12, 2009, plaintiff received 84 cans of the new

7   supplement, and on May 18, 2009, he received another 84 cans.  (Cmplt. ¶¶ 110-111; Dkt. 1-1 at

8   113-114 (Ex. 2H).)

9   III.  Procedural Background

10          Plaintiff filed the instant action on March 31, 2010.  (Cmplt.)  On July 28, 2010,

11  service was ordered upon defendants Nangalama, Hamkar, Ma, Teachout and Sweeney for

12  Eighth Amendment and state law negligence claims.  (Dkt. No. 12, 22.)  Four of the five

13  defendants (all but Sweeney) originally filed a motion to dismiss on November 18, 2010.  (Dkt.

14  No. 26.)  Plaintiff filed an opposition on December 14, 2010.  (Dkt. No. 28.)  These defendants

15  then filed an amended, identical motion to dismiss (now pending) on December 15, 2010.  (See

16  Dkt. No. 41.)  Plaintiff filed a response (opposition) on January 6, 2011 (Dkt. No. 39) and

17  defendants filed a reply on January 20, 2011.  (Dkt. No. 42.)

18          In their opposition, defendants withdraw that portion of the motion to dismiss

19  concerning Teachout's alleged failure to timely provide pillows to plaintiff.  They continue to

20  seek dismissal of plaintiff's claim concerning Teachout's alleged failure to assist plaintiff in

21  obtaining a nutritional supplement drink after plaintiff's surgery.  (Dkt. No. 42 at 8.)

22                                          DISCUSSION

23  I. Legal Standard

24          In order to survive dismissal for failure to state a claim pursuant to Rule 12(b)(6),

25  a complaint must contain more than a "formulaic recitation of the elements of a cause of action;"

26  it must contain factual allegations sufficient to "raise a right to relief above the speculative

1    level."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  "The pleading must contain

2    something more...than...a statement of facts that merely creates a suspicion [of] a legally

3    cognizable right of action."  Id., quoting 5 C. Wright & A. Miller, Federal Practice and Procedure

4    § 1216, pp. 235-236 (3d ed. 2004).  "[A] complaint must contain sufficient factual matter,

5    accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, ___

6    U.S. ___, 129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955).  "A

7    claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

8    the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

9           In considering a motion to dismiss, the court must accept as true the allegations of

10   the complaint in question, Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740

11   (1976), construe the pleading in the light most favorable to the party opposing the motion and

12   resolve all doubts in the pleader's favor.  Jenkins v. McKeithen, 395 U.S. 411, 421, reh'g denied,

13   396 U.S. 869, 90 S. Ct. 35 (1969).  The court will "'presume that general allegations embrace

14   those specific facts that are necessary to support the claim.'"  National Organization for Women,

15   Inc. v. Scheidler, 510 U.S. 249, 256 (1994), quoting Lujan v. Defenders of Wildlife, 504 U.S.

16   555, 561  (1992).  Moreover, pro se pleadings are held to a less stringent standard than those

17   drafted by lawyers.  Haines v. Kerner, 404 U.S. 519, 520 (1972).

18          The court may consider facts established by exhibits attached to the complaint.

19   Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987).  The court may also

20   consider facts which may be judicially noticed, Mullis v. United States Bankruptcy Ct., 828 F.2d

21   1385, 1388 (9th Cir. 1987); and matters of public record, including pleadings, orders, and other

22   papers filed with the court, Mack v. South Bay Beer Distributors, 798 F.2d 1279, 1282 (9th Cir.

23   1986).  The court need not accept legal conclusions "cast in the form of factual allegations."

24   Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

25   \\\\\\

26   \\\\\\

1   II.  Eighth Amendment Claims

2          Plaintiff's cause of action against defendants is for deliberate indifference to

3   plaintiff's serious medical needs in violation of the Eighth Amendment.

4          Denial or delay of medical care for a prisoner's serious medical needs may

5   constitute a violation of the prisoner" Eighth and Fourteenth Amendment rights.  Estelle v.

6   Gamble, 429 U.S. 97, 104-05 (1976).  An individual is liable for such a violation only when the

7   individual is deliberately indifferent to a prisoner's known serious medical needs.  Id.; see Jett v.

8   Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir.

9   2002); Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000).  To establish deliberate

10  indifference, an individual defendant must have "purposefully ignore[d] or fail[ed] to respond to

11  a prisoner's pain or possible medical need."  McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir.

12  1992) overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir.

13  1997).  "Mere negligence in diagnosing or treating a medical condition, without more, does not

14  violate a prisoner's Eighth Amendment rights."  Id. at 1059.  "A difference of opinion between a

15  prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983

16  claim."  Franklin v. Or. State Welfare Div., 662 F.2d 1337, 1344 (9th Cir. 1981).

17         Furthermore, where a prisoner alleges that delay of medical treatment evinces

18  deliberate indifference, the prisoner must show that the delay caused "significant harm and that

19  Defendants should have known this to be the case."  Hallett, 296 F.3d at 745-46; see McGuckin,

20  974 F.2d at 1060.  Mere delay of medical treatment, "without more, is insufficient to state a

21  claim of deliberate medical indifference."  Shapley v. Nev. Bd. of State Prison Comm'rs, 766

22  F.2d 404, 407 (9th Cir. 1985).

23         A.  Dr. Nangalama

24         According to plaintiff's allegations, after reviewing plaintiff's file, Dr.

25  Nangalama erroneously concluded in September 2008 that plaintiff's cancer was benign, despite

26  the fact that, two months earlier, Dr. Polidore had urgently referred plaintiff to an outside

1    specialist for evaluation and treatment of his cancer.  Dr. Nangalama stated that he did not know

2    why plaintiff was "down here," apparently meaning that he did not know why plaintiff was in

3    Sacramento for an appointment with an ENT.  That appointment was cancelled at the last minute

4    for security reasons unrelated to plaintiff.  Dr. Nangalama noted that plaintiff had a follow up

5    appointment with an ENT scheduled for the following week; however,  plaintiff left his office

6    with the impression that he was "going back to" Pelican Bay.

7             Certainly plaintiff's previously diagnosed cancer qualifies a serious medical need.

8    However, despite Dr. Nangalama's dismissive comments, plaintiff has not alleged that Dr.

9    Nangalama interfered with his scheduled ENT appointment.  Rather, plaintiff alleges that,

10   following his appointment with Dr. Nangalama, he was referred to NP Bakewell, who confirmed

11   that plaintiff should attend his ENT evaluation.  Due to scheduling and clerical errors and a

12   mistakenly cancelled appointment, plaintiff was not seen by an outside specialist until December

13   2008. (Cmplt. ¶¶ 27-54.)  However, as it is not alleged that Dr. Nangalama's actions were the

14   cause of this delay or ultimately affected the treatment plaintiff received, the Eighth Amendment

15   claim against him should be dismissed.

16           B. Dr. Hamkar

17           On both November 13, 2008 and December 15, 2008, Dr. Hamkar allegedly was

18   aware that plaintiff required an urgent appointment with an outside specialist for evaluation

19   and/or treatment of his cancer.  In the first instance, Dr. Hamkar's referral form was not clearly

20   marked "urgent" and plaintiff had to obtain another referral from him 19 days later.  Similarly  in

21   the second instance, Dr. Hamkar's referral form was mistakenly marked "routine."  However,

22   "[m]ere negligence in . . . treating a medical condition, without more, does not violate a

23   prisoner's Eighth Amendment rights."  McGuckin, supra, 974 at 1059.  Moreover, despite these

24   errors, plaintiff was seen by an outside specialist on December 9, 2008 and January 5, 2009,

25   respectively.  On January 7, 2009 he underwent a surgical procedure to remove the cancer in his

26   neck, and on January 19, 2008 he was discharged from the hospital in good condition.  Thus the

1 │ complaint does not state an Eighth Amendment claim as to Dr. Hamkar's pre-surgery actions.

2 │      Plaintiff also alleges that Dr. Hamkar and other medical staff failed to ensure that

3 │ plaintiff was provided enough nutritional supplement following his surgery, when he had

4 │ difficulty eating solid food.  Specifically as to Dr. Hamkar, plaintiff alleges that,

> [o]n or about April 9, plaintiff notified Dr. Hamkar that he was
> hungry from the lack of food and the difficulty he was
> experiencing with receiving his correct amount of Nutrien 1.5.
> Plaintiff repeatedly complained of his hunger pains, the blisters in
> his mouth, and the importance of receiving his Nutrien 1.5 before
> the day expired.

9 │ (Cmplt. ¶ 90.)  Plaintiff alleges that Dr. Hamkar did not investigate the problem, and "[a]s a

10 │ result plaintiff underwent seven more days without eating, resulting in hung[er] pains, weight

11 │ loss and stress."  (Id. ¶ 91.)

12 │      On April 15, 2009, a UC Davis nurse contacted Dr. Hamkar concerning the

13 │ availablilty of supplement drinks for plaintiff.  Dr. Hamkar was allegedly dismissive, referring to

14 │ plaintiff and other inmates as "game players," but said he would "see what [he could] sort out."

15 │ (Id. ¶¶ 99-100; Dkt. No. 1-1 at 100 (Ex. 2C).)  Later that day, plaintiff received 42 cans of his

16 │ supplement drink.  (Id. ¶¶ 98-99; Dkt. No. 1-1 at 132 (Ex. 2B).)

17 │      Plaintiff further alleges that Dr. Hamkar and other medical staff knew in advance

18 │ that his supplement, Nutrien, was being discontinued, but failed to provide plaintiff any

19 │ alternative nutrition until the replacement supplement was delivered on May 12, 2009.  (Cmplt.

20 │ ¶¶ 105, 108-110.)  As a result, plaintiff did not have enough supplement from May 7 through

21 │ May 11, 2009, and suffered "pain from the blister in his mouth, starvation, stomach pains,

22 │ weakness and weight loss."  (Id. ¶ 108; Dkt. 1-1 at 108-109 (Ex. 2F); Dkt. 39 at 11.)

23 │      Construing the pleading in the light most favorable to plaintiff, the court finds that

24 │ plaintiff has stated an Eighth Amendment claim as to Dr. Hamkar's, specifically that Dr. Hamkar

25 │ was deliberately indifferent to plaintiff's dietary requirements during his recovery from cancer

26 │ surgery.  See Byrd v. Wilson, 701 F.2d 592, 595 (6th Cir. 1983) (reversing district court's

1  dismissal of deliberate indifference claim where inmate requiring special medical diet was denied

2  medication and special diet for two days).

3          C. <u>Dr. Ma</u>

4          Plaintiff alleges that Dr. Ma was deliberately indifferent in failing to provide

5  plaintiff a special non-fat diet after plaintiff's surgery.  However, it appears from attachments to

6  the complaint that on January 22, 2009, Dr. Ma gave plaintiff the option of transferring to other

7  areas of the prison where special diets were available for non-religious reasons, and plaintiff

8  refused.  (Dkt. No. 1-1 at 61 (1P).)  On January 23, 2009, Dr. Ma prescribed plaintiff two cans,

9  twice a day, of nutritional supplement.  (Cmplt. ¶ 74.)  The court does not find that these

10  allegations state a claim of deliberate indifference as to plaintiff's special diet.

11          Plaintiff also alleges that Dr. Ma was deliberately indifferent by failing to provide

12  plaintiff's medically-ordered pillows after his discharge.  Dr. Ma knew plaintiff required these

13  pillows per his discharge order,  but allegedly did nothing to make sure that plaintiff received

14  them and instead referred him to Nurse Teachout, who had already refused to help him obtain the

15  pillows.  Whether or not an outside medical specialist ordered the pillows connection with

16  plaintiff's post-surgical fluid retention, plaintiff alleges that, without the pillows, he repeatedly

17  gagged on phlegm and saliva at night for over two weeks until the pillows were provided.

18          It well-established that deliberate indifference to a prisoner's medical needs can

19  be demonstrated in multiple ways, as an Eighth Amendment violation may appear when prison

20  officials deny or delay access to medical care, <u>or</u> intentionally interfere with medical treatment

21  once prescribed.  <u>Estelle</u>, <u>supra</u>, 429 U.S. at 104-105;  <u>Wakefield v. Thompson</u>, 177 F.3d 1160,

22  1165 (9th Cir. 1999) ("Following <u>Estelle</u>, we have held that a prison official acts with deliberate

23  indifference when he ignores the instructions of the prisoner's treating physician or surgeon.");

24  <u>see also</u> <u>Johnson v. Figueroa</u>, No. 08-cv-1242-POR (JMA), 2011 WL 3702419 at **7-10

25  (S.D.Cal. Aug. 23, 2011) (finding plaintiff with stroke-related impairments stated medical

26  indifference claims under Rule 12(b)(6) against defendants who subjected plaintiff to black box

                                                14

1  restraints and did not transport him in waist-chains, despite medical orders exempting plaintiff

2  from black box restraints and stating he was to be transported in waist-chains.)  In <u>Johnson</u>, the

3  court also found that plaintiff stated a deliberate indifference claim as to a defendant nurse who

4  had access to plaintiff's medical files, was aware of plaintiff's serious medical condition, and

5  "knowingly refused to schedule Plaintiff for physical therapy appointments in accordance with

6  [doctor's] orders."  <u>Id</u>. at *10.

7         Here, construing the pleadings in the light most favorable to plaintiff, the court

8  finds that plaintiff has alleged that Dr. Ma was deliberately indifferent concerning plaintiff's

9  post-surgical discharge order stating that plaintiff should sleep with his head elevated.

10                D. <u>Nurse Teachout</u>

11         Defendants have withdrawn their motion to dismiss the claim against Nurse

12  Teachout for failing to provide plaintiff with pillows after his surgery.  (Dkt. No. 42 at 8.)  At

13  issue is whether plaintiff has stated a claim under Rule 12(b)(6) concerning Nurse Teachout's

14  alleged failure to assist plaintiff in obtaining enough nutritional supplement.  Plaintiff alleges

15  that, on January 27, 2009, Teachout refused to document or look into why plaintiff had only

16  received four days' worth of nutritional supplement.  (Cmplt. ¶¶ 76-77.)  Attachments to the

17  complaint further indicate that, on May 11, 2009, plaintiff complained to Teachout that he had

18  nothing to eat or drink after Nutrien was discontinued and shipments of the replacement drink

19  were delayed.  Teachout advised him to keep putting requests into the warehouse, but did not do

20  anything further to assist him getting food or drink that he could eat during this period.

21  However, the next day, plaintiff received 84 cans of the new supplement.  The court concludes

22  that these allegations are insufficient to plead deliberate indifference as to Teachout, and will

23  recommend dismissal of the supplement-related claim.

24                E. <u>Qualified Immunity</u>

25         As discussed above, the court finds that plaintiff has stated Eighth Amendment

26  claims as to defendants Hamkar and Ma.  The court now turns to defense counsel's contention

1   that these defendants are entitled to qualified immunity.  "Government officials enjoy qualified

2   immunity from civil damages unless their conduct violates 'clearly established statutory or

3   constitutional rights of which a reasonable person would have known.'" Jeffers v. Gomez, 267

4   F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a

5   court is presented with a qualified immunity defense, the central questions for the court are (1)

6   whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the

7   defendant's conduct violated a statutory or constitutional right and (2) whether the right at issue

8   was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001).

9           Although the court was once required to answer these questions in order, the

10  United States Supreme Court has clarified that "while the sequence set forth there is often

11  appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 555 U.S. 223,

12  236 (2009).  In this regard, if a court decides that plaintiff's allegations do not make out a

13  statutory or constitutional violation, "there is no necessity for further inquiries concerning

14  qualified immunity." Saucier, 533 U.S. at 201.  Likewise, if a court determines that the right at

15  issue was not clearly established at the time of the defendant's alleged misconduct, the court may

16  end further inquiries concerning qualified immunity without determining whether the allegations

17  in fact make out a statutory or constitutional violation.  Pearson, 555 U.S. at 236–42.

18          Here, plaintiff alleges that defendants were deliberately indifferent to his

19  medically-ordered requirements for post-surgical nutrition and care.  At this juncture, the court

20  cannot say what admissible evidence will ultimately prove.  At the pleading stage, however, the

21  court must accept plaintiff's allegations as true.  As noted above, if proven, plaintiff's allegations

22  are sufficient to establish that the defendants were deliberately indifferent to his serious medical

23  needs in violation of the Eighth Amendment.  Moreover, having determined that defendants'

24  alleged conduct is sufficient to violate the Eighth Amendment, the court observes that by 2008,

25  "the general law regarding the medical treatment of prisoners was clearly established," and "it

26  was also clearly established that [prison staff] could not intentionally deny or delay access to

1   medical care." Clement v. Gomez, 298 F.3d 989, 906 (9th Cir. 2002).  In this regard, any

2   reasonable prison official should have known that ignoring plaintiff's needs for post-surgical

3   care, in light of his medical condition and contrary to his doctors' medical recommendations,

4   violated the Eighth Amendment.

5          Accordingly, defendants' motion to dismiss based on the affirmative defense of

6   qualified immunity should also be denied.[6]

7   III.  State Negligence Claims

8          Plaintiff also asserts negligence claims against defendants arising under California

9   based on the same allegations that underlie his federal constitutional claims.

10         Where a federal court has jurisdiction pursuant to 42 U.S.C. § 1983, the court may

11  exercise "pendent" or "supplemental" jurisdiction over closely related state law claims asserted

12  in the complaint.  See Bahrampour v. Lampert, 356 F.3d 969, 978 (9th Cir. 2004) (citing 28

13  U.S.C. § 1367(a)).  "[A] plaintiff's pendent state law claims against a state or state employees are

14  barred unless the plaintiff has complied with the requirements of the California Tort Claims Act

15  ('CTCA') before commencing the civil action."  Wayne v. Leal, 2009 WL 2406299, at *7 (S.D.

16  Cal. 2009) (citing Ortega v. O'Connor, 764 F.2d 703, 707 (9th Cir.1985), rev'd in part on other

17  grounds, 480 U.S. 709 (1987)); see Karim-Panahi v. Los Angeles Police Dept., 839 F.2d 621,

18  627 (9th Cir. 1988) (affirming dismissal of pendent state law claims against public employee

19  where plaintiff failed to allege compliance with the CTCA).  The CTCA applies to claims

20  brought against state employees "for injury resulting from an act or omission in the scope of his

21  employment as a public employee," Cal. Gov't Code § 950.2, and requires that tort claims

22  against state employees be presented to the California Victim Compensation and Government

23  Claims Board (Board), formerly known as the State Board of Control, no more than six months

24  _____

25         [6] Defendants are free to raise the affirmative defense of qualified immunity at the
    summary judgment stage of this action based upon evidence adduced through discovery or
26  otherwise obtained.

                                         17

1    after the cause of action accrues, Cal. Gov't Code §§ 910, 911.2.

2            Here, plaintiff filed a claim with the Board on March 20, 2009.  On May 28, 2009,

3    the Board mailed him a notice stating that they had rejected his claim.  The notice stated that

4    plaintiff had "six months from the date this notice was . . . deposited in the mail to file a court

5    action on this claim."  (Cmplt., Ex. A.)  Pursuant to Cal. Gov't Code § 945.6(a)(1), to be timely,

6    an action must be commenced within 182 days or six months after notice of rejection of the

7    claim is served or placed in the mail, which ever period is longer.  Gonzales v. County of Los

8    Angeles, 199 Cal. App. 3d, 601, 614 (1988).  However, Smith did not constructively file the

9    instant action until nearly ten months later, on March 24, 2010 (per the mailbox rule).  While the

10   district court has discretion to exercise jurisdiction over supplemental state law claims, such

11   discretion can only be exercised if the claim is timely brought under California law.  Thus, the

12   undersigned concludes that plaintiff's state law claims should be dismissed.

13           ACCORDINGLY, IT IS HEREBY ORDERED THAT the Clerk of Court shall

14   assign a district judge to this action.

15           IT IS HEREBY RECOMMENDED THAT:

16           1. Defendants' December 15, 2010 motion to dismiss be granted in part and

17   denied in part, as follows:

18                   a. Granted as to Nangalama, Hamkar (pre-surgery claim), Ma (special diet

19   claim), and Teachout;

20                   b. Denied as to Hamkar (nutritional supplement claim) and Ma (pillow

21   claim).

22           These findings and recommendations are submitted to the United States District

23   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

24   one days after being served with these findings and recommendations, any party may file written

25   objections with the court and serve a copy on all parties.  Such a document should be captioned

26   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

1  shall be served and filed within fourteen days after service of the objections.  The parties are

2  advised that failure to file objections within the specified time may waive the right to appeal the

3  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

4   Dated: February 6, 2012

5

6  CAROLYN K. DELANEY
   UNITED STATES MAGISTRATE JUDGE

7

8

9
   2
10 smit0762.mtd

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26